# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| Lighthouse Brands, Ltd. | : | Case No. 3:04 CV 7634 |
| Plaintiff, | : | |
| vs. | : | |
| Ideas Concepts & Insights Merchandise Group, et al. | : | **MEMORANDUM DECISION AND ORDER** |
| Defendants. | : | |

Parties to this diversity case, filed pursuant to 28 U. S. C. § 1332, consented to the jurisdiction of the undersigned United States Magistrate Judge according to 28 U. S. C. § 636(c). Pending is Plaintiff's Motion for a Preliminary Injunction to which Defendants have filed an Opposition (Docket Nos. 27 & 30). An evidentiary hearing was held on May 20, 2005. For the reasons that follow, the Magistrate denies Plaintiff's Motion for Preliminary Injunction.

## FACTUAL BACKGROUND

Plaintiff, Lighthouse Brands, Ltd. (Lighthouse), an Ohio limited liability company seeks to enjoin Defendants from soliciting customers and prospective customers of Lighthouse. Lighthouse is an advertising specialty business, which designs and markets various "logo or insignia material to companies for distribution to employees, vendors, or customers as a means of promoting brand loyalty" (Docket No. 1,

1

Pl.'s Compl. ¶ 8). Defendant Ideas Concepts & Insights Merchandise Group, Inc. (ICI) is a Minnesota corporation that is currently a member of Lighthouse and was engaged in a similar business prior to becoming a member of Lighthouse. ICI's primary client was Polaris, a manufacturer of snow mobiles, ATVs, and motorcycles (Docket No. 32, Dep. of Todd Weisz, p. 80:22). Defendant Todd Weisz is the sole-shareholder of ICI and a former employee of Lighthouse. Defendants Business Impact Group, LLC, a Minnesota limited liability company and Business Impact Group, Inc., a Minnesota corporation (jointly referred to as BIG) are also engaged in designing and marketing promotional materials for companies.

On November 17, 2003, the members of Lighthouse amended their operating agreement of April 16, 2003 to include ICI. As part of this agreement, Defendant Weisz received a ten percent interest in Lighthouse, which he currently retains (Docket No. 35, Pl.'s Ex. B). Richard Herman, President of R.E. Etchen Company[1], testified that the decision to join ICI as a member was due to ICI's contacts and clients in Minnesota. Richard Herman also testified that Lighthouse invested resources to expand their business in Minneapolis, Minnesota, where Defendant Weisz would work as vice president of sales (hearing testimony). In addition to the amended operating agreement, Defendant Weisz, signed an employment agreement with Lighthouse on November 17, 2003; Defendant Weisz was named as vice president of sales for Lighthouse. The employment agreement did contain a restrictive covenant regarding confidential materials. However, the agreement contained neither a non-solicitation agreement nor a non-compete agreement (Docket No. 35, Pl.'s Ex. C).

---

[1] R.E. Etchen Company is a member of Lighthouse.

On August 24, 2004, Defendant Weisz sent an email to his partners indicating that he wished to leave the partnership and requested that they work on an "exit strategy" (Docket No. 32, Pl.'s Ex. 10). On August 30, 2004, Defendant Weisz indicated that he was resigning from his position of vice president of sales "effective upon ninety (90) days form [sic] today or as we mutually agree on" (Docket No. 32, Pl.'s Ex. 11). Defendant Weisz stated that he believed his resignation was effective upon acceptance of his resignation (Docket No. 32, Dep. of Todd Weisz, p. 184:9-11). Defendant Weisz stated that he had no business activity with ICI after he left Lighthouse (Docket No. 32, *Id.* at 94:7-11). On October 4, 2004, Defendant Weisz started his employment with BIG as a sales person (Docket No. 35, Pl.'s Ex. H). He is currently employed as vice president of the OEM division of BIG (Hr'g test).

Defendant Weisz indicated that he was hired by BIG to solicit companies through his contacts, most of whom were established prior to his partnership with Lighthouse (Docket No. 32, Dep. of Todd Weisz, p. 149:19-24). He admitted giving a source of business to BIG prior to his employment with BIG and he stated that he was uncomfortable with that decision (Docket No. 32, Dep. of Todd Weisz, p. 127:9-17). Defendant Weisz stated that he attempted to stay away from Polaris and other clients of Lighthouse once he began his employment with BIG (Docket No. 32, p. 159:2-6). However, he admits soliciting prospective clients of Lighthouse through his contacts that were established prior to his partnership with Lighthouse[2] (Docket No. 32, p. 208:7-25). Sometime in early 2005, Defendant Weisz indicated that he was considering involvement with some of his previous business contacts including Polaris (Docket No. 32, p. 128:9-11). Eventually, he re-established his contacts with Polaris. In addition, he contacted Rapala,

---

[2]These contacts included Honda and Yamaha.

3

Famous Daves, Yamaha, Honda, and Normark Corp., all of whom were clients or prospective clients of Lighthouse at some time (Docket No. 32, p.208-215).

Lighthouse also employed several other employees through its office in Minneapolis, which included T. J. Thaldorf and Mary Reno who are not parties to this suit but are currently employed by Defendant BIG (Hr'g. test.). T. J. Thaldorf, who was employed as a Sourcing Agent, was required to sign an employment agreement with Lighthouse that included a non-compete clause. (Docket No. 35, Pl.'s Ex. V). Mary Reno, who was employed as a sales coordinator and worked from her home in Fredericksburg, Iowa, did not sign any agreement regarding solicitation, competition, or confidentiality[3] (Hr'g. test.).

Shortly after Defendant Weisz resigned from Lighthouse, Mary Reno submitted her two week notice; her last day of employment with Lighthouse was September 15, 2004 (Docket No. 33, Dep. of Mary Reno, p. 43:20). Richard Herman requested that Mary Reno return all documents to Lighthouse (Hr'g. test.). Mary Reno sent four to eight boxes of paperwork back to Lighthouse (Docket No. 33, Dep. of Mary Reno, p. 39:20-21). She did not send her computer or clean the computer of all confidential material because there was some question as to whether the computer was part of the assets that Defendant Weisz brought to the partnership (Docket No. 32, Dep. of Todd Weisz, p. 162:1-6).

On September 21, 2004, Defendant Weisz contacted Paul Taunton at BIG to arrange a meeting with Mr. Taunton regarding employment prospects for Mary Reno (Docket No. 35, Pl.'s Ex. G). On September 24, 2004, Defendant Weisz confirmed a meeting with Mr. Taunton and Mary Reno for Tuesday

---

[3]Mary Reno was considered to be an independent contractor and received a Form 1099 for tax purposes. Richard Herman testified that it was not customary to have sales coordinators sign employment agreements (hrg. tstmny.).

4

September 28, 2004 (Docket No. 35, *Id.*). On October 4, 2004, Mary Reno began her employment with BIG and is still currently employed by BIG; similar to her arrangements with Lighthouse, she works out of her home and uses the same computer that she used while employed by Lighthouse (Docket No. 35; Pl.'s Ex. H; Docket No. 33, Dep. of Mary Reno, p. 32:14-24).

Mary Reno sent an email to various persons including many employees of Polaris on October 17, 2004 via her ICI email account indicating that she terminated her employment with Lighthouse on September 15, 2004 and was currently employed by BIG. She indicated that she could be contacted at her home phone and through her ICI email address until she received a new email address (Docket No. 35, Pl.'s Ex. L). BIG also employed T. J. Thaldorf on October 20, 2004 (Docket No. 35, Pl.'s Ex. H).

Prior to her last day at Lighthouse, Mary Reno had several contacts with Polaris regarding a collectable line for the Snow 2006 catalog. Mary Reno previously mailed Jim Burgess of Polaris an Excel sheet with a list of collectable items while she was still employed by Lighthouse. Jim Burgess returned the list after deleting certain items (Docket No. 33, Dep. of Mary Reno, p. 70:12-16). On September 10, 2004, Jim Burgess sent Mary Reno an email request that Lighthouse should "get moving" on the collectable line and requested that Mary Reno send images of various products (Docket No. 35, Pl.'s Ex. I).

On September 13, 2004, Jim Burgess confirmed Polaris' interest in the undeleted items on the Excel sheet as well as interest in several additional items (Docket No. 35*, Id.*). Mary Reno testified that once she left Lighthouse, she passed any orders that she received to another employee at Lighthouse to ensure that the orders were filled (Docket No. 33, Dep. of Mary Reno, p. 60:16-20). However, on October 1, 2004, Mary Reno sent the Excel file to Tim Busby at BIG and indicated that Polaris wanted pictures and pricing of the items for the collectable Snow 2006 line (Docket No. 35, Pl.'s Ex. J). Tim

5

Busby responded by indicating that Mary Reno should start that project on her first day of employment (Docket No. 35, *Id.*). Defendant Weisz received a copy of this email (Docket No. 35, *Id.*). During October and November, Mary Reno, as an employee of BIG, worked with Polaris on the collectable line for the Snow 2006 catalog (Docket No. 35, Pl.'s Ex. N).

In the subsequent months, Mary Reno had frequent contacts with Polaris and was involved in ordering Ambassador kits[4] for Polaris which had been previously ordered through Lighthouse (Docket No. 35, Pl's Exs. O, Q; Docket No. 33, Dep. of Mary Reno, p. 107:15-17). In addition, Mary Reno and Tim Busby met with Polaris to propose a high-end line of clothing; however, Polaris was not interested in this proposal (Docket No. 35, Pl.'s Ex. M). Other than the copied reply to Defendant Weisz on October 1, 2004 and another copied reply to Defendant Weisz on October 6, 2004, there is no indication that either T. J. Thaldorf or Defendant Weisz was involved in the Polaris orders with BIG.

## **PRELIMINARY INJUNCTION STANDARD**

Preliminary injunctions are typically issued to preserve the status quo and to prevent additional harm to the moving party. A preliminary injunction will be issued if the following factors are balanced in favor of the moving party: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the preliminary injunction will suffer irreparable harm without the grant of extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; (4) the public benefits from the issuance of the preliminary injunction. *Basicomputer Corp.*

---

[4] Polaris dealers could qualify to become an Ambassador; once qualified, Polaris would send the dealers an Ambassador kit, which contained shirts, sweatshirts, and t-shirts. Dep. of Mary Reno, p. 107:8-14.

6

*v. Scott*, 791 F. Supp. 1280, 1285 (N.D. Ohio 1991), *aff'd*, 973 F.2d 507 (6th Cir. 1992).; *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998); *U.S. v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). While these factors are balanced, the moving party must "*always* demonstrate some irreparable injury before a preliminary injunction may issue." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982). It has been noted that "a plaintiff's harm is not irreparable if it is fully compensable by money damages. However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp.*, 973 F.2d 507, 511 (6th Cir. 1992).

## ANALYSIS

### *Likelihood of Success of Winning on the Merits*

As noted above, a preliminary injunction should only be granted if the moving party has a high likelihood of success of winning on the merits. Plaintiff contends that Defendants Weisz and ICI violated the operating agreement when Defendant Weisz joined Defendant BIG and used confidential information to directly compete against Lighthouse (Docket No. 1, Pl.'s Compl. ¶ 20). Plaintiff asserts that both Weisz and ICI were bound by the operating agreement signed April 16, 2003 and the operating agreement amendment signed November 17, 2003 (Docket No. 1, *Id.*). Whether the agreements apply to Defendants Weisz and ICI or only to Defendant ICI is a factor as to whether the moving party will have success of winning on the merits.

Ohio law establishes that parol evidence may not be permitted to understand the intentions of the party when a document is plain and unambiguous in its meaning. *Seminatore v. Med. Mut. of Ohio*, 737 N.E.2d 1016, 1019, 136 Ohio App. 3d 758, 763 (8th Dist. 2000). Examination of the operating

7

agreement and the amendment indicates that it is clear and unambiguous that the requirement not to compete only applies to the undersigned members of the agreement. Section 5.4.1 states:

> Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member[5], ***or of any Affiliate[6] of any Member***, to conduct any other business or activity whatsoever, and the Member shall not be accountable to the Company or to any Member with respect to that business or activity; provided, however, ***a Member shall not participate in any business or activity, directly or indirectly, which competes with the business of the Company***. The organization of the Company shall be without prejudice to the Members' respective rights (***or the rights of their respective Affiliates***) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

(Docket No. 35, Pl.'s Ex. A) (emphasis added). Plaintiff contends that the operating agreement should apply to Defendant Weisz, because he is the sole shareholder of the undersigned member. However, this clause of the operating agreement conspicuously refers to the members *and their affiliates* when referring to the rights of the members. In contrast, the non-compete covenant specifically refers to members and is silent as to affiliates (Docket No. 35, *Id.*). In *LCP Holding Co. v. Taylor*, the court noted that when an agreement is clear and ambiguous, any non-competition covenant must *exclusively* pertain to the defined entity. 817 N.E.2d 439, 445, 158 Ohio App. 3d 546, 554 (8th Dist. 2004) (upholding the trial courts decision to deny a preliminary injunction because the non-compete clause applied to any "employed

---

[5]***"Member"*** includes "each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company." ***"Person"*** is defined as "an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity" (Docket No. 35, Pl.'s Ex. A).

[6] ***"Affiliate"*** is defined as "with respect to any Member, any Person: (i) that owns more than 50% of the voting interest in the Member; or (ii) in which the Member owns more than 50% of the voting interests; or (iii) in which more than 50% of the voting interests are owned by a Person who has a relationship with the Member described in clause (i) or (ii) above" (Docket No. 35, Pl.'s Ex. A).

security holder" and defendant had transferred his interests to his children). Because the agreement was signed by the member companies and because the non-compete clause in Section 5.4.3 specifically refers to members and *not* affiliates, the covenant not to compete in Section 5.4.3 only applies to ICI.

Plaintiff cites *S & S Aggregate, Inc. v. Brugmann* in support of its argument. 2002 WL 31895120 (Ohio App. 11th Dist. 2002) (unreported). The current case should be distinguished from *S & S Aggregate, Inc.* in which it was found that the appellant violated a covenant not to compete with appellee. *Id.* Appellant had entered into a mineral lease with appellee and agreed to close his sand and gravel processing plant once appellee began operations. The agreement indicated that appellant could not compete with appellee "as an individual, or as a stockholder, partner or investor in a corporation, partnership or any other entity . . ." *Id.* at ¶ 11. Soon after, appellant entered into a lease with a third party, which allowed the third party to operate the plant and appellant transferred his interest in the plant to his son. After the transfer, appellant loaned money to the plant, paid debts of the plant, and received money from the corporation. *Id.* at ¶ 4-5. Based on the wording of the agreement, appellant could not compete in any capacity with appellee. In contrast, the agreement between Lighthouse and its members does not contain any words that would restrict *both* the members and its shareholders or executives from competing with Lighthouse.

In addition, when ICI joined Lighthouse, an amendment to the operating agreement was signed by the members including ICI. The amendment included an added section regarding non-solicitation, intellectual property, and confidentiality. Section 5.6.1 states:

> . . . so long as a Member is a Member of the Company and for a period of one (1) year thereafter, ***such Member shall not solicit or call on, directly or indirectly, any customer of the Company*** outside the course of the Member's duties with the Company

9

>other than for the purpose of soliciting business unrelated to the business of the Company. A customer of the Company shall be any person, firm, corporation or other entity to which the Company has sold products during the preceding twenty-four (24) months.

(Docket No. 35, Pl.'s Ex. B) (emphasis added).

Plaintiff contends that even if the agreement is construed to only apply to the Member ICI, ICI is still an active company, which competed with Lighthouse after Defendant Weisz's voluntary resignation from the company. Plaintiff argues that employees of ICI had access to confidential information, were actively filling orders, and directly interacting with at least one of Lighthouse's clients, Polaris, prior to their employment with BIG. Thus, Plaintiff contends that Mary Reno, as an employee of ICI, was actively working in direct competition prior to her hire date with BIG (Docket No. 28, Pl.'s Memo. in Support of Mot. for Prelim. Inj. 17).

Mary Reno terminated her employment with Lighthouse on September 15, 2004 (Docket No. 33, Dep. of Mary Reno, p. 43:20). Because Mary Reno was hired by BIG on October 4, 2004, Plaintiff alleges that Mary Reno was still an employee of ICI when she began corresponding with Polaris. Therefore, if the court were to find Mary Reno was acting as an employee of ICI on October 1, 2004 when she sent information to Tim Busby of BIG on the collectable line that was originally compiled by Lighthouse, then the Plaintiff *may* have a valid claim that ICI had solicited customers of Lighthouse.

Mary Reno's last day at Lighthouse was September 15, 2004; thus, she was no longer employed by Lighthouse or its undersigned member ICI. Further, at this time there is no indication that she received any compensation from ICIMG from September 15 to October 4, 2004. Because Mary Reno was not an employee of Lighthouse or ICI and she did not sign any restrictive covenants, she was not contractually bound to refrain from soliciting Lighthouse's customers. *Stand. Oil Co. v. Landmark Farm Bureau Co-*

*op.*, 369 N.E.2d 785, 796, 52 Ohio App. 2d 225, 243 (10th Dist. 1976) (*quoting Curry v. Marquart*, 11 N.E.2d 868, 868, 133 Ohio St. 77, 77 (1937) ("In the absence of an express contract not to engage in a competitive pursuit, an employee, upon taking a new employment in a competing business, may solicit for his employer the trade or business of his former customers . . .").

In addition, even though ICI was bound not to solicit Lighthouse customers, Defendant Weisz was not bound by Section 5.6.1 of the operating agreement as an employee of BIG. Thus, Defendant Weisz's interactions with Lighthouse customers during 2005 would not be in violation of this agreement because he was acting as an employee of BIG. Further, the covenant indicates that customers are defined as "any person, firm, corporation or other entity to which the company has sold products during the preceding twenty-four (24) months." Therefore, contacts with companies such as Honda and Yamaha were not restricted. These companies were considered prospective customers but no agreements had been reached with either company in the 24 months prior to Defendant Weisz's resignation.

The operating agreement also contained a clause regarding confidential information. Section 5.6.2 states:

> Except for disclosures that may be required by law or court order and disclosures made to consultants of a Member who agree to be bound by the terms of this Section 5.6.2, so long as a Member is a Member of the Company and for a period of one (1) year thereafter, ***a Member may not divulge to anyone*** (other than the Company or any persons employed or designated by the Company) ***any knowledge or information*** of any type whatsoever ***of a confidential nature*** relating to the business of the Company or any of its subsidiaries or affiliates, including without limitation all types of trade secrets[7]

---

[7]"Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, address, or telephone numbers, that satisfies both of the following:

> (unless readily ascertainable from public or published information or trade sources). Each Member further agrees not to disclose, publish or make use of any such knowledge or information of a confidential nature without the prior written consent of the Company.

(Docket No. 35, Pl.'s Ex. B) (emphasis added). There is no dispute that Mary Reno did have access to sensitive materials regarding Lighthouse's sales and orders. Further, there is no dispute that this information was provided to Mary Reno when she was employed by Defendant Weisz.[8] However, both Defendants Weisz and T. J. Thaldorf were required to sign employment agreements with Lighthouse; Mary Reno was not required to sign an employment agreement and, instead, was treated as an independent contractor. Had Lighthouse insisted that Mary Reno sign an agreement indicating restrictions on the use of the confidential information to which she was exposed, Lighthouse may have been able to enforce a restrictive covenant against her. However, without any contractual agreement, Lighthouse allowed Mary Reno access to sensitive business information and had no recourse against her should she use that information to her benefit once she was no longer a member of ICI. Thus, unless Lighthouse can provide evidence that Mary Reno used that information to benefit BIG while employed at ICI, a preliminary injunction against ICI would be ineffective.

Plaintiff may also assert that Defendant Weisz did provide a contact to BIG prior to his employment with BIG (Docket No. 32, Dep. of Todd Weisz, p. 125:17-25). Thus, as the President of ICI, he violated

---

(1) It derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. OHIO REV. CODE ANN. § 1333.61(D) (Anderson 2002).

[8]Defendant Weisz noted that he has not maintained files for two to three years; instead, Mary Reno was instructed to get and maintain all files on clients and companies (Docket No. 32, Dep. of Todd Weisz, p. 29:7-21).

12

this restrictive clause.  In this one instance, Plaintiff may have a valid claim that Defendant Weisz did violate the restrictive covenant; however, it is questionable, as discussed below, whether this disclosure caused irreparable harm to Lighthouse's business activities.  *See also Wiebold Studio, Inc. v. Old World Restorations, Inc.*, 484 N.E.2d 280, 285, 19 Ohio App. 3d 246, 249 (1st Dist. 1985) (noting that taking the name of a supplier of a unique product does not qualify as a trade secret because it was not necessarily competitively advantageous).

> Finally Section 5.6.4 of the Amendment of the operating agreement states:
>
> Upon termination of a Member's Membership Interest for any reason, the Member shall return to the Company all Company Materials. "Company Materials" means ***all samples, equipment, and other items, as well as all copies of notes, memoranda, lists, records, and other documents, whether on paper or stored on any computer media, made or received by the Member concerning the business of the Company***, regardless of whether such materials constitute confidential information or trade secrets of the Company. "Company Materials" shall also include all records of contacts ***made by the Member while rendering services to the Company***, including by not limited to, all company names, addresses, telephone numbers, email addresses, contact persons and quote details.

(Docket No. 35, Pl.'s Ex. B) (emphasis added).  Plaintiff contends that ICI violated the operating agreement by allowing Mary Reno to continue to work with the computer that she used while employed by ICIMG even though she is currently employed by BIG (Docket No. 28, Pl.'s Memo. in Support of Mot. for Prelim. Inj. 10).  Further, Plaintiff alleges that this computer may have trade information that is unique to their business and that Mary Reno is using this information as a competitive advantage against Lighthouse.  Plaintiff contends that Mary Reno may not have returned all artwork that was purchased by Lighthouse, has current access to their price structure, has current access to Lighthouse's preferred vendors, and is using this information to take clients away from Lighthouse (Docket No. 28, *Id.* at 11).

However, when testifying at the evidentiary hearing, Richard Herman admitted that he never directly asked Mary Reno to return the computer until the deposition. He also stated that the company had no record of the artwork that was developed during the time that Mary Reno and Defendant Weisz were employed at Lighthouse; thus, he cannot confirm whether all artwork was returned to Lighthouse after their resignations. He also noted that it is customary in the trade that a company could take artwork supplied by a company such as Lighthouse and give it to another business to use in the production of promotional materials.

In addition, Richard Herman testified at the hearing that there is no evidence that Mary Reno is using the pricing structure that was used by Lighthouse; rather, she testified that she has always marked up the price of items by thirty to forty percent of cost (Hr'g test.). Because Mary Reno has used this pricing structure prior to working with Lighthouse, this structure cannot be deemed confidential in nature. *See Albert B. Cord Co. v. S & P Mgt. Servs., Inc.*, 207 N.E.2d 247, 249, 2 Ohio App. 2d 148, 149 (1st Dist. 1965) (noting that when an employee has been hired with prior specialized training in the field, that knowledge may not be considered confidential in nature).

Richard Herman also testified that nothing would prohibit Polaris or other clients from providing pricing information to Lighthouse's competitors. Likewise, Richard Herman noted that he does not know whether Mary Reno and Defendant Weisz are using the vendors that were used by Lighthouse. Last, Herman testified that he has no evidence that Mary Reno was even competing against Lighthouse when she made a presentation to Polaris regarding clothing samples (Hr'g test). Given the lack of evidence that Mary Reno and Defendant Weisz are currently using confidential information of Lighthouse, Plaintiff will be unlikely to prevail on the merits.

Defendant Weisz also signed an employment agreement on the same day as the amendment to the operating agreement was signed by ICIMG. Unlike the original operating agreement, the agreement did not include a non-compete clause. However, the agreement did contain several restrictive covenants. Section 9(a) states:

> During the term hereof, the Employee will have access to and become acquainted with various customers, customer lists, prospects, prospect lists, marketing plans, business plans and other trade secrets of the Company. The Employee recognizes and acknowledges that such information, and information on the methods of operation, standard operating procedures, sources of supply, and other confidential records and data compiled by the Company are confidential, valuable, special and unique assets of the business of the Company. The ***Employee will not***, directly or indirectly, during or after termination of this Agreement, ***disclose the information described above to any person, firm, corporation, association or other entity*** for any reason or purpose whatsoever. Upon termination or expiration of this Agreement for any reason, the Employee will surrender to the Company all records and data of every nature, kind and description prepared or kept by him, or others, pertaining to the business of the Company and shall not make or cause to be made any copies thereof.

(Docket No. 35, Pl.'s Ex. C) (emphasis added). In addition, Section 9(b) states:

> The Employee agrees and binds himself . . . to not reveal or disclose to anyone (other than the Company) any confidential data, including, without limitation, the information described in Section 9a hereof, "know how" or trade secrets directly relating to the business of the Company. Upon termination or expiration of this Agreement for any reason, the Employee agrees to not divulge any such confidential information received as a result of his position with the Company.

(Docket No. 35, *Id.*). Plaintiff contends that Defendant Weisz is violating this clause by disclosing confidential information such as customers of Lighthouse to his current employer. Plaintiff also contends that Defendant Weisz is in violation of his employment agreement because he is soliciting prospective clients such as Honda and Yamaha. However, as noted in his deposition, Defendant Weisz brought these contacts to Lighthouse when he became a member (Hr'g test.). Thus, the evidence indicates nearly all of the

15

contacts that Defendant Weisz has disclosed to BIG were contacts prior to his partnership with Lighthouse. As noted in *Chemclear Inc. v. Ameriwaste Envtl. Servs., Inc.*, when an employee brings to a company contacts obtained previously, that information is not considered exclusive to that company. 1992 WL 166548 at *2 (Ohio App. 8th Dist. July 16, 1992) (unreported). Further, many factors are considered in determining whether information is considered a trade secret including the precautions taken to ensure that the information remain secret. *Pyromatics, Inc. v. Petruziello*, 454 N.E.2d 588, 592, 7 Ohio App. 3d 131, 135 (8th Dist. 1983); *Sonkin & Melena, Co. v. Zaransky*, 614 N.E.2d 807, 83 Ohio App. 3d 169 (8th Dist. 1992). There is no evidence that Lighthouse had created a confidential list of clients and vendors. *See Albert Cord Co.*, 207 N.E.2d at 248, 2 Ohio App. 2d at 150 (noting that customer lists that have confidential information may be considered a trade secret, but customer lists created from a former employee's memory are not trade secrets). Likewise, there is nothing in the amendment to the operating agreement to indicate that Defendant Weisz's contacts were given in consideration of the membership so that they became confidential property of Lighthouse (Docket No. 35, Pl.'s Ex. B). Thus, Defendant Weisz, once employed by BIG, could solicit and rely on his previously established contacts because this information was not part of Lighthouse's confidential trade secrets.

*Irreparable Injury*

Additionally, a preliminary injunction will only be granted if the moving party demonstrates that the movant will suffer irreparable injury if the injunction is not granted. *Washington v. Reno*, 35 F.2d. at 1099. Plaintiff asserts that it will sustain irreparable injury because Defendant Weisz is directly soliciting customers and prospective customers of Lighthouse and that he intends to compete with Lighthouse in their Dealer

16

Imprint Program[9] (Docket No. 28, Pl.'s Memo. in Support of Mot. for Prelim. Inj. 12).  As noted above, if a contractual agreement fails to include an *express* non-compete clause, an employee may solicit customers of his former employer.  *Stand. Oil Co.,* 369 N.E.2d at 796, 52 Ohio App. 2d at 243; *Curry*, 11 N.E.2d at 868, 133 Ohio St. at 77.  Thus, even if Lighthouse has lost business from Defendant Weisz's solicitations, he is free to do so as an employee of BIG because no express restrictive clause in his employment agreement prohibited him from soliciting Lighthouse customers.  Further, even if a jury were to find that the Defendants did violate any contractual agreements, the loss incurred by Lighthouse can be calculated.  If BIG has placed reorders that were formally part of Lighthouse's business, then there is a value of lost sales.  As for prospective clients such as Yamaha and Honda, neither BIG nor Lighthouse have established a contract with these companies.  Thus, Lighthouse has not presented persuasive evidence of lost sales to these prospective clients.  *See Fremont Oil Co. v. Marathon Oil Co.*, 192 N.E.2d 123, 131, (Sandusky County Ct. of Common Pleas 1963) (noting that a plaintiff may only seek future lost profits with substantial proof of the actual loss that will be incurred).

*Third Party and Public Interest*

Last, the court must consider whether a third party will be harmed by the issuance of the preliminary injunction and whether there is any public interest in either issuing or failing to issue the preliminary injunction.  Should the court grant a preliminary injunction, both Defendant BIG and Mary Reno would be unable to continue their business activities.  Had either entered into a contractual agreement not to compete with Lighthouse, the injunction would be appropriate; however, neither Defendant BIG nor Mary Reno

---

[9]Lighthouse created a program in which items could be co-branded with both a Polaris logo and a dealer's logo (Docket No. 32, Dep. of Todd Weisz, p. 65:14-19).

17

have any contractual obligations with Lighthouse. Additionally, there is evidence that Polaris did not plan to continue its business relationship with Lighthouse and advised Lighthouse of its decision. Polaris continues to fulfill its contractual obligation to Lighthouse for its Dealer Imprint Program (Docket No. 32, Dep of Todd Weisz, p. 157:10-21). While recognizing the important public policy of enforcing employee contracts, this court cannot impose restrictions on companies that elect to pursue alternative client relationships especially in the absence of any exclusive contractual agreements.

For these reasons, Plaintiff's Motion for Preliminary Injunction is denied.

So ordered.

/s/ Vernelis K. Armstrong
Vernelis K. Armstrong
United States Magistrate Judge